Exhibit A


Gail Sullivan Letter

To Whom it May Concern:

My name is Gail Sullivan. I am Joseph Santoro's mother and am writing this letter on his behalf to tell you about his life and ask for consideration when he is sentenced. Joseph was born with a congenital defect which was a club foot. He had surgery at 6 months old but will always be disabled to some degree. He could never serve in the military and suffered pain all of his life. His father and I had a troubled relationship which involved drugs and alcoholism on both our parts. After losing custody of both my sons in 1988, Joseph and his older brother, Mark lived with their father and his second wife. Their father was a long distance truck driver and gone from them on a regular basis. Left with his wife, Jackie Meltz Santoro, Joseph and Mark suffered mental and physical abuse which his father and I were not aware of at the time. Joseph was punished often and told me she had burned him at one time. The mental abuse caused him to act out and my time with my boys was often denied and Joseph was told I didn't want to see him. His father later divorced his wife and moved Joseph to South Carolina where he wasn't going to school regularly. His father became ill with Hepatitis C. Joseph began working at the age of 13 and literally would carry his father to use the bathroom and did whatever he could to care for him. He was extremely close to his father. His father asked me to bring Joe to my house when he was very ill. Joe was upset with him for that and when I got a call from the hospital saying his father wanted to speak to him, he refused. Hours later his father passed away. This was June 20th, 2000. This was devastating for him . The time he spent living with me after that was tough for him but he had made lots of friends and loved spending time with my mother who lived with us at the time. She had MS and Joe was very caring with her and helped her any way he could.

I got sober in 1998 and was working at Verizon. Joe and his brother both lived with me after their father passed away. Living in Carmel gave Joe a more stable life and he made many friends. However, Joe got involved with drugs and was influenced by the older brother of his friend. He began skipping school. I put him in treatment several times. During his times in jail, Joe got his GED. He did participate in recovery programs offered and during his last time home, he and I went through the training for Hope Not Handcuffs. We completed the requirements but then were told Joe couldn't participate. Sheriff Langley in Carmel was responsible for that decision and refused to meet with Joseph after Joseph requested to. Joseph did work for a flooring company but was injured with a severe laceration to his hand which left him unable to do that work any longer. Joseph successfully regained his driver's license prior to this arrest. He also received his tow endorsement and was actively seeking employment. He is a hard worker and smart. He has a great heart and will always look to help neighbors and family. Joseph is loved and cared about by many friends and family members. I love him dearly and hope any sentence imposed is taking some of the facts of his life into consideration.

Thank you

Sincerely,
Gail K. Sullivan

Exhibit B

People v. DiPippo

50 N.E.3d 888, 31 N.Y.S.3d 421, 2016 N.Y. Slip Op. 02279

27 N.Y.3d 127
Court of Appeals of New York.

The PEOPLE of the State of New York, Respondent,
v.
Anthony DiPIPPO, Appellant.

March 29, 2016.

**Synopsis**

**Background:** Following affirmance of his convictions for second degree murder and first degree rape, 265 A.D.2d 340, 696 N.Y.S.2d 690, defendant's motion for post-conviction relief was denied by the Supreme Court, Putnam County, Neary, J., but on appeal the Supreme Court, Appellate Division, 82 A.D.3d 786, 918 N.Y.S.2d 136, granted relief and remanded for new trial. On retrial, the Supreme Court, Putnam County, Barry E. Warhit, J., convicted defendant of the same crimes, and he appealed. The Supreme Court, Appellate Division, 117 A.D.3d 1076, 986 N.Y.S.2d 243, affirmed. Defendant was granted leave to appeal.

The Court of Appeals, Stein, J., held that defendant should have been permitted to present evidence of third-party culpability to jury.

Reversed, and new trial ordered.

Fahey, J., filed dissenting opinion.

**Attorneys and Law Firms**

***422 Brafman & Associates, P.C., New York City (Mark M. Baker, Benjamin Brafman and Jacob Kaplan of counsel), for appellant.

Adam B. Levy, District Attorney, Carmel (David M. Bishop and Heather M. Abissi of counsel), for respondent.

**OPINION OF THE COURT**

STEIN, J.

**889 *130 On this appeal, defendant Anthony DiPippo argues that the trial court abused its discretion by precluding him from introducing evidence of third-party culpability **890 ***423 during his *131 retrial for felony murder and rape in the first degree. We conclude that, under the circumstances of this case, defendant should have been permitted to present evidence of third-party culpability to the jury.

I.

In 1994, a 12–year–old girl (hereinafter the victim) went missing in Putnam County. Tragically, her remains were found, over one year later, in a wooded area off a dirt road known to some locals as "Marijuana Road." Defendant and one of his friends, Andrew Krivak, were arrested in 1996 and charged with raping and murdering the victim on or about October 3, 1994. Following a jury trial, defendant was convicted of murder in the second degree and rape in the first degree, and he unsuccessfully exhausted his direct appeals (265 A.D.2d 340, 340, 696 N.Y.S.2d 690 [2d Dept.1999], lv. denied 94 N.Y.2d 918, 708 N.Y.S.2d 357, 729 N.E.2d 1156 [2000] ).

On one of defendant's subsequent CPL 440.10 motions, the Appellate Division vacated the judgment of conviction and sentence and remitted the matter for a new trial on the ground that defendant had been denied the effective assistance of trial counsel because his attorney had operated under a conflict of interest (82 A.D.3d 786, 787, 918 N.Y.S.2d 136 [2d Dept.2011], lv. denied 17 N.Y.3d 903, 933 N.Y.S.2d 658, 957 N.E.2d 1162 [2011] ). More specifically, counsel had previously represented Howard Gombert, a possible suspect in the victim's rape and murder, on an earlier rape charge (see id. at 787–788, 918 N.Y.S.2d 136). The Appellate Division concluded that counsel's failure to disclose his prior representation of Gombert to defendant or the trial court, combined with counsel's failure to "conduct even a minimal investigation" into Gombert's potential involvement in the crimes for which defendant stood accused, demonstrated that the conflict operated on counsel's representation of defendant (id. at 791, 918 N.Y.S.2d 136).

Upon his retrial, defendant sought to admit evidence suggesting that Gombert was the perpetrator of the crimes with which defendant was charged. Defendant made an offer of proof to the court detailing the evidence that he claimed supported his third-party culpability defense. Foremost amongst this evidence was the affidavit of Joseph Santoro, who was incarcerated with Gombert in

Connecticut [1] and claimed that Gombert **132** had made incriminating admissions in April 2011 with respect to his involvement in the victim's death.

According to Santoro's affidavit, Gombert told him that Putnam County authorities were "trying to get him for the killing of two girls" in the Putnam County area. Gombert named the victim as one of the girls, asserting that, in any event, "they already convicted some other suckers" in connection with her death. Santoro asked Gombert, "[s]o the other guys didn't do it?" and, according to Santoro, Gombert laughed and responded that "[e]ven if they didn't, they got no evidence against me. It's been a long time since then." Thereafter, Gombert made a derogatory sexual comment about the victim, prompting Santoro to ask whether Gombert had sexual relations with her. Gombert explained to Santoro that he had met the victim at his former girlfriend's house, and was attracted to her. Gombert claimed that the victim **891 ***424** "flirted with him a lot" and offered to babysit for Gombert's child, but Gombert declined the babysitting offer because he was with the child's mother at the time. According to Santoro, Gombert then stated that "[t]he only way he could get [the victim] into his car was to tell her he wanted her to babysit for his daughter" and that, after he did so, he had sex with the victim in a red car with a black hood. Santoro elicited from Gombert that this occurred at "the time [the victim] disappeared." When Santoro told Gombert that he would be better off keeping quiet, Gombert told him that " '[i]t don't matter now. They already got those other guys/suckers so I'm in the clear.' " Santoro also described sexual comments made by Gombert about the victim on a separate occasion, at which point Gombert told Santoro that the victim did not want to have sex with him, but he "had to persuade her." In addition, Gombert made statements regarding a second missing girl, identified by first name, who had indeed gone missing, and whose body he claimed would never be found by the police. Santoro interpreted Gombert's statements to him as boasts that Gombert had killed both girls, and that defendant and Krivak were wrongly prosecuted for killing the victim.

Defendant's proffer supplemented Santoro's affidavit with the statements of various witnesses establishing that Gombert knew the victim, having met her at his former girlfriend's house, where the victim often spent time with the former **133** girlfriend and her children. Defendant also submitted statements establishing that the victim had discussed babysitting Gombert's child with Gombert and his then-girlfriend. Gombert's then-girlfriend and another witness also confirmed that Gombert had regular access to and routinely

drove the girlfriend's car, which was red with a black hood and had Connecticut license plates. The girlfriend further informed police that, after they saw a missing person poster for the victim, Gombert told her that he had given the victim a ride in her car the previous week.

In addition, defendant proffered notes from a police officer indicating that a witness, Anita Albano, had seen the victim, on the last day that she was seen alive, getting into a compact red vehicle with Connecticut license plates, driven by a young man with whom the victim appeared to be familiar. When Albano viewed a photograph array, she stated that the person in picture number two, if anybody, looked like the driver; photograph number two depicted Gombert. Finally, defendant tendered what he termed "reverse *Molineux* " (*People v. Molineux,* 168 N.Y. 264, 273, 61 N.E. 286 [1901] ) evidence, namely, allegations that Gombert had raped and sexually assaulted other girls and women in what he claimed was a similar manner to that which was alleged with regard to the victim.

Initially, County Court denied defendant's motion to admit the third-party culpability evidence because it found that Albano had not identified Gombert as the driver of the vehicle she saw the victim enter on the day she disappeared, but the court later reopened the matter to hear testimony from Albano regarding her observations. At that hearing, Albano testified that she had not identified Gombert, who was older than the person she saw, as the driver; rather, she claimed to have told the police officers that the driver was not depicted in the photographs but that Gombert, if anyone, bore some resemblance to the driver. Albano further testified that, a few days before the hearing, she was shown a picture of the red vehicle belonging to Gombert's former girlfriend, and that it was not the vehicle that she had seen on the day in question. Two police **892 ***425** officers corroborated aspects of this testimony.

In light of Albano's testimony and the absence of any direct evidence placing Gombert with the victim on the day she was last seen alive, County Court held that defendant had failed to present sufficient evidence pointing to Gombert as the perpetrator, and that Gombert's alleged statements to Santoro were **134** inadmissible hearsay. County Court thereafter denied defendant's request to reconsider its ruling.

At trial, the People presented evidence generally establishing that the victim was last seen alive on October 3, 1994. A few witnesses testified that they saw the victim at a gas station that night, in the company of, among others, defendant

and Krivak. According to the prosecution's main witness, the victim, defendant, Krivak, the witness, and two other male friends were driving home from the gas station in Krivak's van when Krivak pulled off to the side of "Marijuana Road." The witness testified that two of the men were consuming drugs in the front seat, and that she and the others were drinking alcohol and smoking marihuana in the back when Krivak began grabbing at the victim, who resisted. According to the witness, Krivak threw the victim to the floor of the van, pulled off her clothing, tied her hands with rope, shoved her underwear in her mouth, tied her bra around her face, and raped her. A few minutes later, the witness asserted, defendant also raped the victim who, by the end, appeared "lifeless." The witness testified that Krivak and defendant wrapped the victim in her clothes, picked her up, and left her somewhere outside the van.

The witness admitted, however, that she did not disclose any of this information to the police the first two times she spoke to them, and it was not until two years after the alleged murder, when she received warnings from the police that she could be charged, that she implicated defendant and Krivak. Further, the witness's credibility was impeached by questions concerning her drug use that night and, more generally, around the time of the victim's disappearance, as well as by her admission that she continued to associate with defendant after the alleged crimes were committed.

The victim's remains were found with rope tied around her wrists—which were behind her back—and looped around her neck and down to her ankle in a "hogtied" position. The victim did not appear to have been wearing clothing, and the deteriorated remains of her underwear were found balled up at the top of the skeleton's spine. A consultant with the medical examiner's office opined that the location of the underwear was consistent with it having been inside the victim's mouth, and testified that this could have caused asphyxiation. Several pieces of jewelry later identified as belonging to the victim were found in Krivak's van.

 *135  Defendant testified in his own defense and adamantly denied his guilt. Defendant also attempted to persuade the jury that the People's main witness was not credible given her initial denial of any knowledge of the crime. To that end, the two uncharged men who the People's main witness claimed were in the van when the victim was allegedly raped and killed testified that they were not present that evening and denied any knowledge of the crimes. Both of these witnesses admitted that they had each previously signed statements

indicating that they were in the van when defendant and Krivak committed the crime, but they claimed to have made those statements only as a result of police coercion. Another friend of defendant testified that police officers tried to persuade him to sign a statement indicating that he **893 ***426 had seen the victim with defendant and Krivak that night, but he refused because it was not true. Finally, one of the victim's school teachers testified that she saw the victim at the mall five days after she was allegedly killed by defendant and Krivak.

 The jury found defendant guilty of felony murder and rape in the first degree, and defendant was sentenced to an aggregate prison term of 25 years to life. On defendant's appeal, the Appellate Division affirmed (117 A.D.3d 1076, 986 N.Y.S.2d 243 [2d Dept.2014] ). As relevant here, the Appellate Division held that the trial court had "providently exercised its discretion in denying [defendant's] motion to introduce the proffered [third-party culpability] evidence" (id. at 1076, 986 N.Y.S.2d 243). A Judge of this Court granted defendant leave to appeal (24 N.Y.3d 1083, 1 N.Y.S.3d 9, 25 N.E.3d 346 [2014] ), and we now reverse.

II.

 "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense' " (Nevada v. Jackson, 569 U.S. ——, ——, 133 S.Ct. 1990, 1992, 186 L.Ed.2d 62 [2013], quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 [1986]; see Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 [2006]; People v. Carroll, 95 N.Y.2d 375, 385, 718 N.Y.S.2d 10, 740 N.E.2d 1084 [2000] ). Where a defendant seeks to pursue a defense of third-party culpability at trial, evidence offered in support of that defense is subject to "the general balancing analysis that governs the admissibility of all evidence" (People v. Primo, 96 N.Y.2d 351, 356, 728 N.Y.S.2d 735, 753 N.E.2d 164 [2001] ). Thus, a court must determine whether the evidence is relevant and, if so, whether "its probative value is outweighed by the prospect of trial delay, undue prejudice to the opposing party, confusing the issues or *136 misleading the jury" (id. at 355, 728 N.Y.S.2d 735, 753 N.E.2d 164; see People v. Negron, 26 N.Y.3d 262, 268, 22 N.Y.S.3d 152, 43 N.E.3d 362 [2015] ). Further, "[t]he admission of evidence of third-party culpability may not rest on mere suspicion or surmise" (Primo, 96 N.Y.2d at 357, 728 N.Y.S.2d 735, 753 N.E.2d 164; see Holmes, 547 U.S. at 327, 126 S.Ct. 1727; People v. Schulz, 4 N.Y.3d 521, 529, 797

N.Y.S.2d 24, 829 N.E.2d 1192 [2005] ). Generally, "[r]emote acts, disconnected and outside of the crime itself, cannot be separately proved to show that someone other than the defendant committed the crime" (*Schulz,* 4 N.Y.3d at 529, 797 N.Y.S.2d 24, 829 N.E.2d 1192 [internal quotation marks and citation omitted] ). Where, as here, the defendant makes an offer of proof to the court explaining the basis for a third-party culpability defense and connecting the third party to the crime, and the probative value of the evidence "plainly outweighs the dangers of delay, prejudice and confusion," then it is "error as a matter of law" to preclude the defendant from presenting such proof to the jury (*Primo,* 96 N.Y.2d at 357, 728 N.Y.S.2d 735, 753 N.E.2d 164).

In *People v. Primo,* we held that it was error to preclude third-party culpability evidence where a ballistics report linked the bullets recovered from the scene of the charged shooting to a gun used by a third party—who was identified as being present at the time of the shooting—in an unrelated assault two months later (*see id.*). In contrast, we have held that speculative assertions that other unidentified individuals had a motive to harm a victim are insufficient to support admission of third-party culpability evidence (*see People v. King,* 27 N.Y.3d 147, 157–158, 31 N.Y.S.3d 402, 50 N.E.3d 869 [2016] [decided **894 ***427 herewith]; *People v. Gamble,* 18 N.Y.3d 386, 398, 941 N.Y.S.2d 1, 964 N.E.2d 372 [2012] ). We have also upheld the preclusion of third-party culpability evidence where the defendant proffers only general evidence establishing that an identified third party has committed the same type of crime in the same general area close in time to the charged crime (*see Schulz,* 4 N.Y.3d at 529, 797 N.Y.S.2d 24, 829 N.E.2d 1192). Yet, while we have held that proof connecting a third party to the *crime* may establish the probative value of the proffered evidence, we have never held that there must, in every case, be proof directly linking the third party to the *crime scene;* indeed, we have recently held that, in certain circumstances, third-party culpability evidence may be admitted absent such direct evidence (*see Negron,* 26 N.Y.3d at 269, 22 N.Y.S.3d 152, 43 N.E.3d 362).

Here, our evaluation of defendant's third-party culpability proffer begins with Santoro's statement, which faces a threshold evidentiary hurdle—namely, the question of whether Gombert's declarations are admissible under the hearsay exception for declarations against penal interest. A statement *137 may be admitted as a declaration against penal interest where: the declarant is unavailable as a witness at trial; the declarant was aware the statement was against his or her penal interest when it was made; the declarant had

competent knowledge of the facts underlying the statement; and "supporting circumstances independent of the statement itself ... attest to its trustworthiness and reliability" (*People v. Settles,* 46 N.Y.2d 154, 167, 412 N.Y.S.2d 874, 385 N.E.2d 612 [1978]; *see People v. Shabazz,* 22 N.Y.3d 896, 898, 977 N.Y.S.2d 141, 999 N.E.2d 504 [2013] ). There can be no serious dispute that the first three of these requirements are satisfied here. It is undisputed that Gombert would have invoked his right against self-incrimination if he was called to the stand, he was certainly aware that his statements indicating that he had sexually assaulted the victim were against his penal interest, and he had competent knowledge of his own involvement in the victim's life and death. It is the last of the required elements—the reliability of the statement —that raises a question.

With regard to that element, we have held that, "[t]o circumvent fabrication and insure the reliability of ... statements [against penal interest], there must be some evidence, independent of the declaration itself, which fairly tends to support the facts asserted therein" (*Settles,* 46 N.Y.2d at 168, 412 N.Y.S.2d 874, 385 N.E.2d 612; *see People v. Shortridge,* 65 N.Y.2d 309, 313, 491 N.Y.S.2d 298, 480 N.E.2d 1080 [1985] ). When considering the reliability of a declaration, courts should also consider the circumstances of the statement, such as, among other things, the declarant's motive in making the statement —i.e., whether the declarant exculpated a loved one or inculpated someone else, the declarant's personality and mental state, and "the internal consistency and coherence of the declaration" (*Shortridge,* 65 N.Y.2d at 313, 491 N.Y.S.2d 298, 480 N.E.2d 1080). Where, as here, the statement is offered by the defendant, this element is satisfied if the supportive evidence "establishes a reasonable possibility that the statement might be true" (*Settles,* 46 N.Y.2d at 169–170, 412 N.Y.S.2d 874, 385 N.E.2d 612; *see Shabazz,* 22 N.Y.3d at 898, 977 N.Y.S.2d 141, 999 N.E.2d 504). Furthermore, "[c]ircumstances of seeming indifference may still harmonize the declarant's statement so as to furnish the necessary link" (*Settles,* 46 N.Y.2d at 169, 412 N.Y.S.2d 874, 385 N.E.2d 612). Significantly, "[w]hether a court believes the statement to be true is irrelevant, and the **895 ***428 question of admissibility is to be resolved without regard to the seeming strength or weakness of the People's case" (*Settles,* 46 N.Y.2d at 170, 412 N.Y.S.2d 874, 385 N.E.2d 612).

In this case, there is no obvious motive for Gombert to falsely implicate himself; rather, it was in his best interest

to keep quiet about the supposed innocence of defendant and Krivak **138** *(compare Shortridge,* 65 N.Y.2d at 313, 491 N.Y.S.2d 298, 480 N.E.2d 1080). Nor is there any evidence that Gombert had a mental condition that would explain his unprompted statements alluding to his involvement in the victim's death. The statement itself was internally consistent and coherent, with no apparent contradictions. Most significantly, almost all of Gombert's claims, as recounted by Santoro, were corroborated by outside sources, including the fact that Gombert knew the victim, the circumstances under which he had met her, that they had discussed having her babysit for his child, that Gombert had access to a vehicle generally matching the description of the car as given to Santoro, and that Gombert knew the other identified missing girl.[2] Under these circumstances, the fourth element of the *Settles* test is satisfied. Thus, had Santoro testified at trial, Gombert's statements to him would have been admissible.

In light of their admissibility, Gombert's declarations connected him to the crime and, when Santoro's proposed testimony is considered in combination with the additional proffered evidence, defendant's third-party culpability proffer was compelling and highly probative of the question of who killed the victim. In particular, in addition to the corroboration of the individual facts in Santoro's affidavit by statements from outside witnesses, defendant's "reverse *Molineux* " evidence satisfied his burden regarding the proffer.

While unlikely to be sufficient standing alone, we have previously recognized that reverse *Molineux* evidence—i.e., evidence that a third party has committed bad acts similar to those the defendant is charged with committing—is relevant to, and can support, a third-party culpability proffer where the crimes reflect a "modus operandi" connecting the third party to the charged crimes (*see Schulz,* 4 N.Y.3d at 528, 797 N.Y.S.2d 24, 829 N.E.2d 1192; *see also People v. Bunge,* 70 A.D.3d 710, 711, 894 N.Y.S.2d 97 [2d Dept.2010]; *United States v. Aboumoussallem,* 726 F.2d 906, 911 [2d Cir.1984]; *State v. Garfole,* 76 N.J. 445, 451, 388 A.2d 587, 590 [1978] ["The same concept of relevancy which justifies submission of other-crimes evidence by the State supports it when proffered by the defendant"] ). Typically, in evaluating evidence of similar acts for the presence of a modus operandi when such evidence is offered by the People, we look to whether the "similarities were **139** unusual enough to compel the inference that the [same individual] committed both. Thus, the ... *modus operandi* must be sufficiently unique to make the evidence of the uncharged crimes 'probative

of the fact that [the individual] committed the one charged' " (*People v. Beam,* 57 N.Y.2d 241, 251, 455 N.Y.S.2d 575, 441 N.E.2d 1093 [1982], quoting *People v. Condon,* 26 N.Y.2d 139, 144, 309 N.Y.S.2d 152, 257 N.E.2d 615 [1970]; *see People v. Mateo,* 93 N.Y.2d 327, 332, 690 N.Y.S.2d 527, 712 N.E.2d 692 [1999]; *People v. Allweiss,* 48 N.Y.2d 40, 47, 421 N.Y.S.2d 341, 396 N.E.2d 735 [1979] ). Although defendant urges us to adopt a more relaxed standard **896 ***429** for such proof when it is offered on behalf of the defense (*see e.g. Aboumoussallem,* 726 F.2d at 911–912; *United States v. Stevens,* 935 F.2d 1380, 1404 [3d Cir.1991]; *State v. Scheidell,* 227 Wis.2d 285, 304, 595 N.W.2d 661, 671 [1999] ), we have no need to do so here because defendant's proof meets the ordinary standard for evaluating such evidence.

Specifically, defendant's written proffer tended to demonstrate that at least two other victims of sexual assaults by Gombert—both of whom, like the victim here, were known to Gombert prior to the assaults and were children at the relevant times—alleged that Gombert had sexually assaulted them, on some occasions in the woods, while restraining their hands (in at least one instance with a rope in a "hogtied" fashion), and shoved articles of clothing in their mouths. Taken together, these characteristics of the alleged rapes and, in particular, the shoving of the clothing in the victims' mouths—which is consistent with the state of the victim's body when it was found and the prosecution's theory of the potential cause of her death—are sufficiently unique for those bad acts to qualify as modus operandi evidence connecting Gombert to the victim's death (*see Allweiss,* 48 N.Y.2d at 48, 421 N.Y.S.2d 341, 396 N.E.2d 735).[3] Thus, to the extent defendant has proffered allegations of sexual assault against other victims containing this combination of characteristics, the reverse *Molineux* evidence supports his third-party culpability proffer.

Viewed in its totality, if proved through appropriate witness testimony at trial, defendant's proffer demonstrated that: **140** Gombert knew and had access to the victim; he was familiar with the road near which the victim's remains were found; he had a history of allegedly assaulting other young girls with whom he was familiar in a manner uniquely similar to the prosecution's theory of how the victim was killed; and that Gombert allegedly made statements indicating that he had sexually abused the victim around the time of her disappearance and that defendant and Krivak were prosecuted for crimes that he had committed. As in *Primo,* this evidence was sufficiently probative to be admissible (*see* 96 N.Y.2d at 357, 728 N.Y.S.2d 735, 753 N.E.2d 164). Contrary to County

Court's determination and the dissent's position, defendant's inability to place Gombert with the victim on the day, or at the precise location, of her disappearance does not eviscerate the probative value of defendant's third-party culpability evidence or render it speculative (*cf. Negron,* 26 N.Y.3d at 269, 22 N.Y.S.3d 152, 43 N.E.3d 362). Such evidence would undoubtedly strengthen any proffer. However, the strength of the evidence necessary to establish the admissibility of proof relating to a third party's culpability will depend, among other things, on the nature of the crime. Here, inasmuch as the exact time and place of the crime are subject to dispute given the circumstances of the victim's disappearance and the lengthy period of time that elapsed before her body was discovered —which explains the absence of direct proof in defendant's proffer tying Gombert to the crime scene—Gombert's **897 ***430 declarations against penal interest are sufficiently probative. Thus, although a jury would be free to discredit Santoro's account of defendant's admissions and defendant's theory that Gombert was actually the perpetrator, it was error to preclude him from presenting the evidence in question because "its probative value plainly outweigh[ed] the dangers of delay, prejudice and confusion" (*Primo,* 96 N.Y.2d at 357, 728 N.Y.S.2d 735, 753 N.E.2d 164; *cf. Negron,* 26 N.Y.3d at 269, 22 N.Y.S.3d 152, 43 N.E.3d 362; *compare King,* 27 N.Y.3d at 157–158, 31 N.Y.S.3d 147, 50 N.E.3d 869; *Gamble,* 18 N.Y.3d at 398, 941 N.Y.S.2d 1, 964 N.E.2d 372; *Schulz,* 4 N.Y.3d at 528, 797 N.Y.S.2d 24, 829 N.E.2d 1192).

In so holding, we do not alter the rules of admissibility for third-party culpability evidence. The facts as presented in *Primo* do not, as the dissent implies, constitute the minimum proof required for the admission of evidence of third-party culpability. It is true that the defendant in *Primo* was able to connect the gun used in commission of the charged shooting to a third party, who the shooting victim placed at the scene (*see* 96 N.Y.2d at 357, 728 N.Y.S.2d 735, 753 N.E.2d 164). Tellingly, however, we have no victim in this case who can identify those present at the time of death, and *141 the instrument of the victim's death cannot be connected to *either* defendant or Gombert. This case is, therefore, plainly distinguishable from *Primo* and, understandably, the type of third-party culpability proof available to defendant here is different; nevertheless, it does not lack in probative value or fail to establish Gombert's connection to the crime.

Nor is our holding contrary to our ruling in *People v. Schulz,* where we determined that the trial court properly precluded evidence of third-party culpability (4 N.Y.3d at 528, 797 N.Y.S.2d 24, 829 N.E.2d 1192). At his trial for robbery in

that case, the defendant sought to admit a photograph of a third party who had committed several robberies in the same general area before and after the robbery for which the defendant was charged, and who allegedly bore a resemblance to the defendant. We upheld the court's preclusion of third-party culpability evidence in *Schulz* because nothing in the defendant's proffer "show[ed] a modus operandi, a witness who saw [the third party] at the scene[,] or even a connection between the getaway car and [the third party]" (*id.* at 528, 797 N.Y.S.2d 24, 829 N.E.2d 1192). Put simply, the third-party proffer there consisted of nothing more than the fact that the third party had committed other crimes of the same general type, but not necessarily sharing particularly similar or unique features. By contrast, here, as we explained, defendant has offered evidence of a unique modus operandi that potentially connects Gombert to the crime, and the statements Gombert allegedly made to Santoro—as well as other proof—connect him to the victim at the approximate time of her disappearance. Thus, defendant's third-party proffer sufficiently supplied the key elements that we found lacking in *Schulz.* The trial court should have permitted defendant to submit admissible proof at trial to support his third-party culpability defense.

Although the evidence presented by the People was arguably overwhelming, we cannot say, on these facts, that the error in curtailing defendant's ability to present a complete defense through the introduction of third-party culpability evidence was harmless (*see People v. Osorio,* 75 N.Y.2d 80, 87, 550 N.Y.S.2d 612, 549 N.E.2d 1183 [1989]; *People v. Crimmins,* 36 N.Y.2d 230, 242–243, 367 N.Y.S.2d 213, 326 N.E.2d 787 [1975] ). Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

***431 FAHEY, J. (dissenting).
**898 For the first time, we are allowing a theory of third-party culpability to go forward based on an offer of proof consisting entirely of hearsay. Defendant's offer of *142 proof fell far short of that presented in *People v. Primo,* 96 N.Y.2d 351, 728 N.Y.S.2d 735, 753 N.E.2d 164 (2001), the only case before today in which this Court has held that a trial court abused its discretion as a matter of law in precluding such evidence. This decision imposes an undue restraint upon the discretion of trial courts to weigh the probative versus prejudicial value of third-party culpability evidence and make a reasoned decision regarding its admissibility. I respectfully dissent.

Howard Gombert's alleged statement to Joseph Santoro was required to surmount a threshold evidentiary hurdle by satisfying the four-pronged test of the hearsay exception for declarations against penal interest. The first three elements of that test were met. I disagree with the majority, however, that Gombert's alleged statements to Santoro satisfied the final prong—that defendant presented "supporting circumstances independent of the statement itself ... to attest to its trustworthiness and reliability" (*People v. Settles*, 46 N.Y.2d 154, 167, 412 N.Y.S.2d 874, 385 N.E.2d 612 [1978] ). Even under the more lenient standard applied when a defendant seeks to introduce a declaration against interest as exculpatory evidence (*see People v. Soto*, 26 N.Y.3d 455, 462, 23 N.Y.S.3d 632, 44 N.E.3d 930 [2015] ), the fourth factor of the test, which is "the most important aspect of the exception" (*People v. Shabazz*, 22 N.Y.3d 896, 898, 977 N.Y.S.2d 141, 999 N.E.2d 504 [2013] [internal quotation marks omitted] ), was not met.

Defendant's proffered evidence of third-party culpability fell into four categories. First, defendant sought to introduce Gombert's alleged statements to Santoro. Second, defendant sought to introduce other evidence allegedly connecting Gombert to the crime, which consisted of the statements of Anita Albano and Gombert's former girlfriend. Gombert's former girlfriend told police that shortly after the victim's disappearance, Gombert told her that he had given the victim a ride to some unspecified place on some unspecified day around the time that the victim went missing. Gombert did not tell her that he had committed a crime or that he was involved in the victim's disappearance. Further, although Albano testified at the pretrial hearing, her testimony did not inculpate Gombert, inasmuch as she testified that the red car she saw the victim enter on the day of her disappearance was not the car of Gombert's former girlfriend, and that Gombert was not the young man whom Albano saw driving the red car. Third, defendant offered statements from certain witnesses who told police that Gombert knew the victim and that the victim had **\*143** offered to babysit for Gombert. Finally, defendant sought to introduce "reverse *Molineux* " evidence regarding Gombert's history of sexual assaults.

Every piece of evidence that defendant presented in an attempt to demonstrate the reliability of Gombert's statements to Santoro was hearsay. Gombert's statement to his former girlfriend that he had given the victim a ride was hearsay, as was his former girlfriend's statement to police itself. Statements from witnesses asserting that Gombert knew the victim and that she had offered to babysit were hearsay. The proffered "reverse *Molineux* " evidence was also hearsay. Defendant offered that proof through a defense investigator, an obviously interested party. Defendant did not offer any statements, **\*\*899 \*\*\*432** sworn or unsworn, from Gombert's victims themselves.

To be clear, I am not suggesting that a defendant seeking to introduce evidence of third-party culpability must present *all* evidence in support of that application in admissible form at the pretrial stage. Here, *nothing* was in admissible form, except for the testimony of Albano, which did not support defendant's application.

The quality of the proof the defendant offers must be considered in evaluating whether the trial court abused its discretion as a matter of law in precluding the evidence. Defendant did not submit an affidavit from Gombert's former girlfriend, or any of the witnesses who defendant asserted could establish Gombert's relationship with the victim. Defendant did not present an affidavit from any of Gombert's victims to support his reverse *Molineux* application, and he further failed to present an affidavit from the defense investigator who allegedly interviewed these victims. In short, defendant asked the trial court to admit Gombert's statement to Santoro not based upon "sufficient competent evidence independent of the [statement itself] to assure its trustworthiness and reliability" (*People v. Brensic*, 70 N.Y.2d 9, 15, 517 N.Y.S.2d 120, 509 N.E.2d 1226 [1987] ), but rather based upon questionable hearsay.

Defendant has acknowledged that he will be required to offer the live testimony of Gombert's victims and any other appropriate witnesses upon retrial. In his pretrial application, however, defendant did not indicate that any of these witnesses were willing to testify at trial. Faced with the unreliable and speculative nature of the evidence defendant offered in an attempt to support the trustworthiness of Gombert's statement **\*144** to Santoro, the trial court did not abuse its discretion as a matter of law in concluding that defendant failed to satisfy the fourth prong of the *Settles* test (*see Settles*, 46 N.Y.2d at 167, 412 N.Y.S.2d 874, 385 N.E.2d 612).

Even assuming Gombert's alleged statements to Santoro qualified as a declaration against penal interest, I nevertheless cannot conclude that the trial court abused its discretion as a matter of law in precluding evidence of third-party culpability.

In *Primo,* we rejected the "clear link" standard for admissibility of third-party culpability evidence that had been employed by the Appellate Division, which generally required the defendant to show a "clear link" between the third party and the crime in question, in favor of a test "described in terms of conventional evidentiary principles" (*see Primo,* 96 N.Y.2d at 354–355, 728 N.Y.S.2d 735, 753 N.E.2d 164). Under that test, the trial court should conduct a discretionary balancing for the probative value of the evidence against its potential for "trial delay, undue prejudice to the opposing party, confusing the issues or misleading the jury" (*id.* at 355, 728 N.Y.S.2d 735, 753 N.E.2d 164). We noted that, "[t]o the extent that the 'clear link' standard implies no more than an abbreviation for the conventional balancing test, it presents no problem" (*id.* at 356, 728 N.Y.S.2d 735, 753 N.E.2d 164).

Even under the proper test, however, "remote evidence of a third party's culpability—though relevant—will not be sufficiently probative to outweigh the risk of trial delay, undue prejudice or jury confusion" (*id.* at 356, 728 N.Y.S.2d 735, 753 N.E.2d 164). We cautioned in *Primo* that, in the context of third-party culpability evidence, the "risks of delay, prejudice and confusion are particularly acute," and that if these risks are not "weighed against the probative value of the evidence, the fact-finding process would break down under a mass of speculation and conjecture" ( **\*\*900** **\*\*\*433** *id.* at 356–357, 728 N.Y.S.2d 735, 753 N.E.2d 164). For these reasons, "[t]he admission of evidence of third-party culpability may not rest on mere suspicion or surmise" (*id.* at 357, 728 N.Y.S.2d 735, 753 N.E.2d 164).

The evidence of third-party culpability defendant offered here was far weaker than the evidence offered by the defendant in *Primo.* There, the shooting victim acknowledged that the third party was at the crime scene at the time of the shooting. Significantly, a ballistics report linked the bullets recovered from the crime scene to a gun used by the third party two months later in an unrelated crime (*see Primo,* 96 N.Y.2d at 353–354, 728 N.Y.S.2d 735, 753 N.E.2d 164). We concluded that the probative value of the ballistics report, "coupled with proof that [the third party] was at **\*145** the scene of the shooting, ... plainly outweigh[ed] the dangers of delay, prejudice and confusion" (*id.* at 357, 728 N.Y.S.2d 735, 753 N.E.2d 164). We therefore held that the trial court improperly precluded the ballistics report as evidence of third-party culpability (*see id.*).

Here, by contrast, there is no physical evidence connecting Gombert to the crime, and no witness placing Gombert with the victim on the day of her disappearance, let alone at the crime scene. The reverse *Molineux* evidence presented by defendant, although it points to Gombert as a heinous individual, does not persuade me that the trial court abused its discretion as a matter of law. Defendant's investigator allegedly spoke to several of Gombert's victims, and they told the investigator that Gombert only sometimes restrained their hands behind their backs or shoved articles of clothing in their mouths during his sexual assaults (*cf. People v. Beam,* 57 N.Y.2d 241, 252, 455 N.Y.S.2d 575, 441 N.E.2d 1093 [1982] ["Although there are minor differences in each attack, the pattern of the initial encounter and the specifics of the sexual attacks, all of which followed the same pattern, indicate a unique *modus operandi* "] ).

This Court has generally left the resolution of issues surrounding third-party culpability to the discretion of the trial court, unless the evidence of third-party culpability was so unmistakably strong that it was an abuse of discretion for the trial court not to allow the jury to hear it (*see Primo,* 96 N.Y.2d at 357, 728 N.Y.S.2d 735, 753 N.E.2d 164). Where the defendant's proffer has fallen short of the strong proof of third-party culpability presented in *Primo,* this Court has not interfered with the discretionary determination of the trial court (*see People v. King,* 27 N.Y.3d 147, 31 N.Y.S.3d 402, 50 N.E.3d 869 [2016] [decided herewith]; *People v. Gamble,* 18 N.Y.3d 386, 398–399, 941 N.Y.S.2d 1, 964 N.E.2d 372 [2012], *rearg. denied* 19 N.Y.3d 833, 945 N.Y.S.2d 643, 968 N.E.2d 999 [2012]; *People v. Schulz,* 4 N.Y.3d 521, 529, 797 N.Y.S.2d 24, 829 N.E.2d 1192 [2005] ). This Court should not interfere in those discretionary determinations unless the evidence, like that presented in *Primo,* is so compelling that the trial court clearly abused its discretion as a matter of law in precluding it. I conclude that the evidence offered by defendant here does not rise to that level.

Although defendant will finally be required to present proof of third-party culpability in admissible form at a new trial, the trial court must otherwise exercise its discretion to ensure that "the fact-finding process [does not] break down under a mass of speculation and conjecture" (*Primo,* 96 N.Y.2d at 357, 728 N.Y.S.2d 735, 753 N.E.2d 164). The determination of admissibility can only be answered at trial. The trial court should be allowed to exercise its discretion upon **\*146** retrial with respect to these issues. Faced with the prospect of another appellate reversal, however, the trial court here, and other **\*\*901** **\*\*\*434** trial courts attempting to comply with the Court's ruling in the future, will be reluctant to do so.

Defendant's remaining contentions are without merit. I would affirm the order of the Appellate Division.

Judges PIGOTT, RIVERA and ABDUS–SALAAM concur; Judge FAHEY dissents in an opinion; Chief Judge DiFIORE and Judge GARCIA taking no part.

Order reversed and a new trial ordered.

**All Citations**

27 N.Y.3d 127, 50 N.E.3d 888, 31 N.Y.S.3d 421, 2016 N.Y. Slip Op. 02279

## Footnotes

1   Gombert was incarcerated for crimes that included attempted sexual assault of an eight-year-old girl and third-degree sexual assault of one of his girlfriends (*see State v. Gombert,* 80 Conn.App. 477, 479, 836 A.2d 437, 441 [2003]; *Gombert v. Warden,* 2013 WL 4873470, *1, 2013 Conn Super LEXIS 1895, *1 [Aug. 22, 2013, No. CV104003855S] ).

2   Almost all of these facts were provable without resort to hearsay and—contrary to the dissent's suggestion—the trial court did not find the form of defendant's offer of proof to be insufficient in determining that Gombert's admissions were unreliable.

3   While defendant did not present this proof to the court through affidavits of the other alleged victims, we note that the court did not request that he do so and, while that may have been preferable, we do not find this omission to be fatal to his proffer. Further, defendant offered to have his defense investigator testify to the victims' statements in support of his proffer. Defense counsel has acknowledged that, if he had been permitted to offer the third-party culpability evidence at trial, it would have been necessary to have offered the testimony of the appropriate witnesses, themselves, so as to avoid any hearsay problems.

---

**End of Document**                               © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit C

People v. Krivak

186 A.D.3d 1712
Supreme Court, Appellate Division,
Second Department, New York.

The PEOPLE, etc., Appellant,

v.

Andrew F. KRIVAK, Respondent.

2019–06055
|
Ind.No. 39/96
|
Argued—September 8, 2020
|
September 30, 2020

**Synopsis**

**Background:** After his conviction for murder in the second degree and rape in the first degree was affirmed, 265 A.D.2d 343, 696 N.Y.S.2d 480, defendant moved to vacate on the grounds of newly discovered evidence. The decision by the County Court, Putnam County, Victor J. Alfieri, Jr., J, to deny the motion was reversed on appeal, 168 A.D.3d 979, 92 N.Y.S.3d 110, and on remand, David S. Zuckerman, J., granted the motion. State appealed.

The Supreme Court, Appellate Division, held that newly discovered evidence that witnesses at trial for rape and murder had given false testimony and that another suspect had confessed to killing the victim warranted vacation of defendant's judgment of conviction.

Affirmed.

**Procedural Posture(s):** Appellate Review; Post-Conviction Review.

**Attorneys and Law Firms**

**\*\*382** Robert V. Tendy, District Attorney, Carmel, N.Y. (Larry Glasser of counsel), for appellant.

Cuomo LLC, Mineola, N.Y. (Karen A. Newirth and Oscar Michelen of counsel), for respondent.

ALAN D. SCHEINKMAN, P.J., JOHN M. LEVENTHAL, ROBERT J. MILLER, PAUL WOOTEN, JJ.

DECISION & ORDER

**\*1712** Appeal by the People from an order of the County Court, Putnam County (David S. Zuckerman, J.), entered May 9, 2019. The order, after a hearing, granted the defendant's motion pursuant to CPL 440.10 to vacate a judgment of the same court (William B. Braatz, J.), rendered June 11, 1997, convicting him of murder in the second degree and rape in the first degree, upon a jury verdict, and imposing sentence (*see People v. Krivak,* 265 A.D.2d 343, 696 N.Y.S.2d 480), and for a new trial on the ground of newly discovered evidence.

ORDERED that the order is affirmed.

**\*1713** In 1996, the defendant and Anthony DiPippo (hereinafter the codefendant) were arrested in connection with the death of a 12–year–old girl (hereinafter the victim), whose remains were discovered in a wooded area in Putnam County. While in custody, the defendant, then 18 years old, made a statement to law enforcement authorities, confessing that he and the codefendant had raped and murdered the victim.

At separate trials for the defendant and the codefendant, the People presented testimony **\*\*383** from, among others, Denise Rose, who stated that she was present during the commission of the crimes and whose account closely matched the information in the defendant's written statement. The People also presented testimony from William MacGregor, who stated that he was present with, among others, the defendant, the codefendant, and the victim, as indicated in the defendant's written statement, but was barely conscious during the events that followed due to the consumption of drugs and alcohol.

The defendant and the codefendant both were convicted of murder in the second degree and rape in the first degree. The codefendant made a series of motions pursuant to CPL 440.10 to vacate the judgment, which were denied. However, on appeal from the denial of one of those motions, this Court vacated the codefendant's judgment of conviction and remitted the matter for a new trial on the ground that the codefendant was deprived of the effective assistance of counsel (*see People v. DiPippo,* 82 A.D.3d 786, 787, 918 N.Y.S.2d 136). Specifically, the codefendant's trial counsel had previously represented Howard Gombert, a possible suspect in the rape and murder of the victim, on an earlier rape charge. This Court determined that the codefendant's trial

counsel failed to disclose his prior representation of Gombert and to "conduct even a minimal investigation" into Gombert's potential involvement in the crimes, and thus, counsel had a conflict of interest which affected his representation of the codefendant (*id.* at 791, 918 N.Y.S.2d 136).

Prior to the commencement of the codefendant's retrial, the codefendant sought to admit evidence of the third-party culpability of Gombert. Specifically, the codefendant relied on, among other things, evidence that Gombert had raped and sexually assaulted other young girls and women in a similar manner to that alleged with regard to the subject victim, and an affidavit of Joseph Santoro, wherein Santoro relayed various statements allegedly made to him by Gombert while they were incarcerated together. According to Santoro, Gombert stated that the authorities were " 'trying to get him for the killing of two girls' " in the Putnam County area, one of whom was *1714 the victim, but that " 'they already convicted some other suckers' " in connection with the victim's death (*People v. DiPippo,* 27 N.Y.3d 127, 132, 31 N.Y.S.3d 421, 50 N.E.3d 888). Santoro averred that when he asked Gombert, " '[s]o the other guys didn't do it?,' " Gombert responded that " '[e]ven if they didn't, they got no evidence against me. It's been a long time since then' " (*id.*). Santoro continued that Gombert "made a derogatory sexual comment about the victim, prompting Santoro to ask whether Gombert had sexual relations with her," and Gombert then relayed the details of how he had sex with the victim around the time the victim " 'disappeared' " (*id.*). Santoro also indicated that he told Gombert he "would be better off keeping quiet," to which Gombert responded, " '[i]t don't matter now. They already got those other guys/suckers so I'm in the clear' " (*id.*). The trial court denied the codefendant's motion to admit evidence of third-party culpability.

During the codefendant's retrial, Rose confirmed her prior statement that she witnessed the commission of the crimes. However, MacGregor testified that he had given false testimony during the original trials and signed a false statement due to threats made to him by members of the Putnam County Sheriff's Department, and that the police had left him in a room with Rose "for her to tell the story she was given."

**384 The jury found the codefendant guilty of murder in the second degree and rape in the first degree, and this Court affirmed the codefendant's second judgment of conviction (*see People v. DiPippo,* 117 A.D.3d 1076, 986 N.Y.S.2d 243, *revd* 27 N.Y.3d 127, 31 N.Y.S.3d 421, 50 N.E.3d

888). However, the Court of Appeals reversed the judgment of conviction and ordered a new trial on the ground that the codefendant should have been permitted to present the evidence of third-party culpability (*see People v. DiPippo,* 27 N.Y.3d 127, 31 N.Y.S.3d 421, 50 N.E.3d 888). The Court of Appeals determined that "[a]lthough the evidence presented by the People was arguably overwhelming, we cannot say, on these facts, that the error in curtailing [the codefendant's] ability to present a complete defense through the introduction of third-party culpability evidence was harmless" (*id.* at 141, 31 N.Y.S.3d 421, 50 N.E.3d 888). Following a third trial, at which the defense presented the testimony of Santoro regarding Gombert's statements, the jury acquitted the codefendant.

Prior to the codefendant's third trial, the defendant moved pursuant to CPL 440.10 to vacate his judgment of conviction and for a new trial based upon newly discovered evidence, including the third-party culpability evidence relating to Gombert. The County Court denied the defendant's motion without a hearing. However, on appeal, this Court remitted the *1715 matter to the County Court for a hearing and a new determination of the defendant's motion thereafter (*see People v. Krivak,* 168 A.D.3d 979, 92 N.Y.S.3d 110).

Upon remittitur, the County Court conducted a hearing, at which testimony was elicited from Santoro regarding the statements made to him by Gombert, including Gombert's statements that "they couldn't get me" for the crimes involving the victim because "[t]hey already got the two other suckers." At the close of the hearing, the court found that Santoro's testimony was "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the Defendant." In an order entered May 9, 2019, the court granted the defendant's motion pursuant to CPL 440.10 to vacate the judgment. The People appeal.

Initially, to the extent the County Court failed to comply with the requirement to "set forth on the record its findings of fact, its conclusions of law and the reasons for its determination" as required by CPL 440.30(7), we find that the record is sufficient to enable us to intelligently review the order granting the defendant's motion, and thus, make our own findings of fact and conclusions of law (*see People v. Mingo,* 141 A.D.3d 423, 35 N.Y.S.3d 80; *People v. Dover,* 294 A.D.2d 594, 595, 743 N.Y.S.2d 501).

CPL 440.10(1)(g) provides that a court may vacate a defendant's judgment of conviction on the ground of newly discovered evidence where, insofar as relevant here, the evidence "is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant." "The power to vacate a judgment of conviction on the ground of newly discovered evidence rests within the discretion of the hearing court," which "must make its final decision based upon the likely cumulative effect of the new evidence had it been presented at trial" (*People v. Cain,* 96 A.D.3d 1072, 1073, 947 N.Y.S.2d 168).

Here, we find that the newly discovered evidence "is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10[1][g] ). A reasonable **385 jury could credit Santoro's testimony regarding the statements made by Gombert, including that he could not be charged with the rape and murder of the victim because "[t]hey already got the other suckers," and find that such statements raise a reasonable doubt as to the defendant's involvement in the subject crimes (*see People v. Bellamy,* 84 A.D.3d 1260, 1262, 923 N.Y.S.2d 681). Moreover, had Santoro's testimony been available to the defendant *1716 at trial, defense counsel could have advanced the theory that Gombert was the actual perpetrator of the crimes, rather than merely denying the defendant's involvement (*see People v. Malik,* 81 A.D.3d 981, 982, 917 N.Y.S.2d 648). In fact, the codefendant was acquitted following his third trial, at which Santoro's testimony was admitted for the first time.

Further, although the evidence presented at the defendant's trial included the defendant's statement confessing to the crimes, the record reveals the existence of circumstances casting doubt on that statement. The portion of the defendant's statement regarding how he tied the victim's hands together was inconsistent with the testimony of a medical examiner for the People as to the manner in which the victim was "hogtied" with rope. In addition, the defendant presented testimony at trial from a polygraph examiner, who opined that the defendant was telling the truth during a polygraph examination when he initially denied raping and killing the victim. Moreover, we note that various witnesses who initially implicated the defendant and the codefendant have recanted their statements and indicated that they were coerced by the police into making a false statement. For instance, MacGregor, a prosecution witness at the original trials, has since testified that the police left him in a room with Rose

"for her to tell the story she was given," and that he signed a false statement due to police threats. Thus, the defendant has a potential basis to argue that his statement was the result of a pattern of police coercion, which has a reasonable probability of raising a reasonable doubt in the minds of the jurors if presented in conjunction with Santoro's testimony (*see People v. Deacon,* 96 A.D.3d 965, 969, 946 N.Y.S.2d 613).

The People's remaining contentions are without merit.

Accordingly, the County Court providently exercised its discretion in granting the defendant's motion pursuant to CPL 440.10 to vacate his judgment of conviction and for a new trial.

Motion by the appellant, inter alia, to strike the respondent's brief, or stated portions of the respondent's brief, on an appeal from an order of the County Court, Putnam County, entered May 9, 2019, on the ground that stated portions of the respondent's brief refer to matter dehors the record. By decision and order on motion of this Court dated May 28, 2020, the branch of the motion which is, inter alia, to strike the respondent's brief, or stated portions of the respondent's brief, was held in abeyance and referred to the panel of Justices hearing the appeal for determination upon the argument or submission thereof.

Upon the papers filed in support of the motion and the papers filed in opposition thereto, and upon the argument of the appeal, it is

ORDERED that the branch of the motion which is to strike stated portions of the respondent's brief is granted to the extent that the following portions of the respondent's brief have been stricken and have not been considered in the determination of this appeal: (1) the second paragraph on page five through the first paragraph on page seven; and (2) the first **386 paragraph on page 30 through the first paragraph on page 31; and it is further,

ORDERED that the branch of the motion which is to strike stated portions of the respondent's brief is otherwise denied.

SCHEINKMAN, P.J., LEVENTHAL, MILLER and WOOTEN, JJ., concur.

131 N.Y.S.3d 381, 2020 N.Y. Slip Op. 05226

**All Citations**

186 A.D.3d 1712, 131 N.Y.S.3d 381, 2020 N.Y. Slip Op. 05226

---

**End of Document**                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit D

Joseph Santoro Letter

Dear Judge Roman,

I would like to start off by apologizing for my actions and the harm they have caused. I try not make many excuses for my actions but I recognize that drug addiction and lack of mental health counselling have contributed led me down the wrong path. Moving forward I plan to relocate to Florida to start a new life around good people. I have friends and family in FLA that already have a plan to help me with employment and housing. Thank you for taking the time to read this.

**Table 31**

**SENTENCE IMPOSED RELATIVE TO THE GUIDELINE RANGE**
**BY TYPE OF CRIME[1]**
**Fiscal Year 2020**

| TYPE OF CRIME | TOTAL | WITHIN GUIDELINE RANGE | | DEPARTURE | | | | | | | VARIANCE | |
| | | | | UPWARD | | §5K1.1 | | §5K3.1 | | DOWNWARD | | | |
| | | N | % | N | % | N | % | N | % | N | % | N | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL** | 64,233 | 32,358 | 50.4 | 261 | 0.4 | 5,270 | 8.2 | 6,918 | 10.8 | 2,534 | 3.9 | 16,892 | 26.3 |
| **Administration of Justice** | 537 | 257 | 47.9 | 4 | 0.7 | 39 | 7.3 | 3 | 0.6 | 37 | 6.9 | 197 | 36.7 |
| **Antitrust** | 11 | 1 | 9.1 | 0 | 0.0 | 5 | 45.5 | 0 | 0.0 | 0 | 0.0 | 5 | 45.5 |
| **Arson** | 48 | 22 | 45.8 | 2 | 4.2 | 3 | 6.3 | 0 | 0.0 | 1 | 2.1 | 20 | 41.7 |
| **Assault** | 605 | 301 | 49.8 | 9 | 1.5 | 26 | 4.3 | 2 | 0.3 | 46 | 7.6 | 221 | 36.5 |
| **Bribery/Corruption** | 240 | 32 | 13.3 | 0 | 0.0 | 81 | 33.8 | 0 | 0.0 | 16 | 6.7 | 111 | 46.3 |
| **Burglary/Trespass** | 38 | 17 | 44.7 | 0 | 0.0 | 3 | 7.9 | 0 | 0.0 | 2 | 5.3 | 16 | 42.1 |
| **Child Pornography** | 1,022 | 313 | 30.6 | 11 | 1.1 | 22 | 2.2 | 0 | 0.0 | 55 | 5.4 | 621 | 60.8 |
| **Commercialized Vice** | 53 | 21 | 39.6 | 0 | 0.0 | 6 | 11.3 | 1 | 1.9 | 2 | 3.8 | 23 | 43.4 |
| **Drug Possession** | 399 | 352 | 88.2 | 2 | 0.5 | 2 | 0.5 | 0 | 0.0 | 1 | 0.3 | 42 | 10.5 |
| **Drug Trafficking** | 16,372 | 5,298 | 32.4 | 57 | 0.3 | 3,297 | 20.1 | 1,176 | 7.2 | 734 | 4.5 | 5,810 | 35.5 |
| **Environmental** | 126 | 56 | 44.4 | 0 | 0.0 | 9 | 7.1 | 0 | 0.0 | 12 | 9.5 | 49 | 38.9 |
| **Extortion/Racketeering** | 119 | 38 | 31.9 | 0 | 0.0 | 26 | 21.8 | 0 | 0.0 | 6 | 5.0 | 49 | 41.2 |
| **Firearms** | 7,533 | 3,899 | 51.8 | 54 | 0.7 | 407 | 5.4 | 4 | 0.1 | 304 | 4.0 | 2,865 | 38.0 |
| **Food and Drug** | 31 | 16 | 51.6 | 2 | 6.5 | 0 | 0.0 | 0 | 0.0 | 2 | 6.5 | 11 | 35.5 |
| **Forgery/Counter/Copyright** | 198 | 103 | 52.0 | 2 | 1.0 | 17 | 8.6 | 0 | 0.0 | 3 | 1.5 | 73 | 36.9 |
| **Fraud/Theft/Embezzlement** | 4,767 | 2,258 | 47.4 | 20 | 0.4 | 512 | 10.7 | 33 | 0.7 | 156 | 3.3 | 1,788 | 37.5 |
| **Immigration** | 26,479 | 16,832 | 63.6 | 49 | 0.2 | 173 | 0.7 | 5,688 | 21.5 | 862 | 3.3 | 2,875 | 10.9 |
| **Individual Rights** | 70 | 26 | 37.1 | 0 | 0.0 | 10 | 14.3 | 0 | 0.0 | 7 | 10.0 | 27 | 38.6 |
| **Kidnapping** | 66 | 25 | 37.9 | 1 | 1.5 | 7 | 10.6 | 0 | 0.0 | 8 | 12.1 | 25 | 37.9 |
| **Manslaughter** | 38 | 22 | 57.9 | 3 | 7.9 | 2 | 5.3 | 0 | 0.0 | 3 | 7.9 | 8 | 21.1 |
| **Money Laundering** | 878 | 203 | 23.1 | 14 | 1.6 | 268 | 30.5 | 7 | 0.8 | 48 | 5.5 | 338 | 38.5 |
| **Murder** | 294 | 108 | 36.7 | 2 | 0.7 | 64 | 21.8 | 1 | 0.3 | 25 | 8.5 | 94 | 32.0 |
| **National Defense** | 165 | 60 | 36.4 | 0 | 0.0 | 21 | 12.7 | 1 | 0.6 | 13 | 7.9 | 70 | 42.4 |
| **Obscenity/Other Sex Offenses** | 318 | 164 | 51.6 | 5 | 1.6 | 3 | 0.9 | 0 | 0.0 | 18 | 5.7 | 128 | 40.3 |
| **Prison Offenses** | 453 | 266 | 58.7 | 2 | 0.4 | 4 | 0.9 | 2 | 0.4 | 20 | 4.4 | 159 | 35.1 |
| **Robbery** | 1,315 | 554 | 42.1 | 9 | 0.7 | 157 | 11.9 | 0 | 0.0 | 71 | 5.4 | 524 | 39.8 |
| **Sexual Abuse** | 881 | 373 | 42.3 | 4 | 0.5 | 56 | 6.4 | 0 | 0.0 | 49 | 5.6 | 399 | 45.3 |
| **Stalking/Harassing** | 224 | 119 | 53.1 | 5 | 2.2 | 3 | 1.3 | 0 | 0.0 | 17 | 7.6 | 80 | 35.7 |
| **Tax** | 365 | 101 | 27.7 | 0 | 0.0 | 45 | 12.3 | 0 | 0.0 | 14 | 3.8 | 205 | 56.2 |
| **Other** | 588 | 521 | 88.6 | 4 | 0.7 | 2 | 0.3 | 0 | 0.0 | 2 | 0.3 | 59 | 10.0 |

[1]  Of the 64,565 cases, 332 were excluded because information was missing from the submitted documents that prevented the comparison of the sentence and the guideline range   Descriptions of variables used in this table are provided in Appendix A

SOURCE:  U S  Sentencing Commission, 2020 Datafile, USSCFY20

Exhibit F

Table 40 to 2020 Annual Report and Sourcebook of
Federal Sentencing Statistics

**Table 40**

**EXTENT OF DOWNWARD VARIANCES**
**BY TYPE OF CRIME[1]**
**Fiscal Year 2020**

| TYPE OF CRIME | N | Mean | | | Median | | |
|---|---|---|---|---|---|---|---|
| | | Sentence In Months | Decrease In Months | Percent Decrease | Sentence In Months | Decrease In Months | Percent Decrease |
| TOTAL | 15,404 | 47 | 25 | 44.8 | 24 | 14 | 36.1 |
| Administration of Justice | 181 | 8 | 13 | 66.5 | 4 | 9 | 71.4 |
| Antitrust | 5 | 14 | 25 | 72.5 | 8 | 21 | 77.7 |
| Arson | 16 | 65 | 29 | 39.6 | 33 | 23 | 32.1 |
| Assault | 175 | 42 | 19 | 45.4 | 24 | 12 | 35.1 |
| Bribery/Corruption | 107 | 16 | 22 | 64.3 | 9 | 12 | 66.7 |
| Burglary/Trespass | 14 | 7 | 11 | 73.7 | 0 | 9 | 99.7 |
| Child Pornography | 591 | 79 | 49 | 38.9 | 72 | 41 | 38.1 |
| Commercialized Vice | 19 | 9 | 9 | 63.8 | 6 | 6 | 50.0 |
| Drug Possession | 20 | 0 | 3 | 95.2 | 0 | 2 | 100.0 |
| Drug Trafficking | 5,528 | 73 | 36 | 38.1 | 60 | 24 | 31.0 |
| Environmental | 48 | 3 | 12 | 81.3 | 1 | 10 | 88.2 |
| Extortion/Racketeering | 43 | 19 | 20 | 58.3 | 12 | 12 | 63.0 |
| Firearms | 2,533 | 35 | 18 | 42.6 | 24 | 12 | 33.3 |
| Food and Drug | 11 | 26 | 29 | 60.8 | 33 | 30 | 52.9 |
| Forgery/Counter/Copyright | 69 | 8 | 14 | 68.0 | 4 | 11 | 82.8 |
| Fraud/Theft/Embezzlement | 1,660 | 18 | 15 | 58.5 | 12 | 10 | 51.6 |
| Immigration | 2,627 | 10 | 8 | 48.7 | 7 | 6 | 40.0 |
| Individual Rights | 26 | 35 | 28 | 56.2 | 21 | 12 | 51.2 |
| Kidnapping | 16 | 108 | 113 | 46.4 | 85 | 69 | 45.5 |
| Manslaughter | 6 | 15 | 25 | 72.9 | 9 | 26 | 82.4 |
| Money Laundering | 320 | 50 | 38 | 51.2 | 24 | 21 | 44.6 |
| Murder | 45 | 166 | 80 | 32.1 | 176 | 67 | 28.6 |
| National Defense | 69 | 35 | 31 | 52.8 | 24 | 22 | 50.0 |
| Obscenity/Other Sex Offenses | 117 | 11 | 10 | 51.9 | 10 | 9 | 46.7 |
| Prison Offenses | 151 | 8 | 8 | 52.9 | 6 | 6 | 50.0 |
| Robbery | 454 | 82 | 29 | 30.6 | 65 | 21 | 22.7 |
| Sexual Abuse | 264 | 153 | 68 | 32.6 | 151 | 57 | 28.6 |
| Stalking/Harassing | 62 | 18 | 11 | 50.7 | 12 | 8 | 39.2 |
| Tax | 198 | 10 | 14 | 64.8 | 6 | 12 | 66.7 |
| Other | 29 | 9 | 13 | 82.9 | 0 | 6 | 100.0 |

---

[1] Of the 64,565 cases, in 15,710 the sentence was a variance below the guideline range, either due to a government motion for a variance (3,774) or a non-government variance (11,936).  Due to an inability to calculate the extent of departure for cases with a guideline minimum of life, 128 offenders were excluded from this table.  Also, 177 offenders were excluded due to several logical criteria.  Of the remaining 15,405 cases, one was excluded due to missing sentence information.  Sentences greater than 470 months and probation were included in the sentence average computations as 470 months and zero months, respectively.  The information in this table includes conditions of confinement as described in USSG §5C1.1.  Descriptions of variables used in this table are provided in Appendix A.

SOURCE:  U.S. Sentencing Commission, 2020 Datafile, USSCFY20.